# Federal Defenders
## OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, N.Y. 10601
Tel: (914) 428-7124 Fax: (914) 997-6872

MEMO ENDORSED

**David E. Patton**
*Executive Director
and Attorney-in-Chief*

Jennifer Brown
*Attorney-in-Charge*

February 18, 2021

<u>BY ECF</u>

The Honorable Kenneth M. Karas
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

**Re:**   *United States v. Jara*, **18cr0400-KMK**

Dear Judge Karas:

I write on behalf of my client, Isaac Jara, who is serving a 120-month term of imprisonment at the Bureau of Prisons (BOP) Federal Medical Center in Devens, Massachusetts (FMC Devens). The Court imposed sentence on October 19, 2018, subsequent to Mr. Jara's pleading guilty to a violation of 18 U.S.C. § 2252A(a)(5)(B), possession of child pornography. The Court also imposed lifetime supervised release. The 120-month term was the product of a statutory mandatory minimum that applied due to his 2014 conviction for violating the same statute. <u>Id.</u> at § 2252A(b)(2). Notwithstanding applicability of the 120-month statutory mandatory minimum, the negotiated plea agreement identified a guidelines range of 57 to 72 months' imprisonment. August 28, 2018 Presentence Report (PSR) at ¶¶ 3, 100.

**Background**

As of February 3, 2021, Mr. Jara has served three years, ten months, and seven days in federal custody (more than 46 months). Exhibit A at 4. Forty-six months is 45% of the eight-and-a-half years Mr. Jara will serve assuming he receives all of his good time credit, which he has to date. <u>Id.</u> Notably, 46 months' custody is 80% of 57-months - the low end of the guidelines range before application of the statutory mandatory minimum. Had a mandatory minimum not applied and had the Court imposed the low-end of the stipulated guidelines range, Mr. Jara would be within months of release. The BOP calculates Mr. Jara's projected release date as October 4, 2025. <u>Id.</u> at 1.

Mr. Jara suffers from, among other things, "morbid" obesity, sleep apnea and Type 2 diabetes mellitus. Exhibit B at 1-2, 13. As recently as January 22, 2021, BOP health providers at FMC Devens determined that Mr. Jara "weighs approximately 349 [pounds] with a BMI of 48.7." <u>Id.</u> at 1; <u>see also id.</u> at 13 (indicating a BMI of 51). BOP health providers prescribed Mr. Jara a new CPAP machine in mid-January. <u>Id.</u> The Centers for Disease Control and Prevention (CDC) acknowledge

that Mr. Jara's "severe" or "extreme" obesity and his Type 2 diabetes both make him more susceptible to contracting COVID-19 and more likely to suffer greater symptoms of the virus. Mr. Jara's medical records also indicate that he suffers from exertional dyspnea (shortness of breath on exertion) affecting both his cardiovascular and pulmonary systems, id. at 6, has been diagnosed with a major depressive disorder, id. at 13, has a past medical history that is significant for asthma, id. at 10, and has had periodic issues ambulating and standing within the last three to four months, id. at 7-11, which required issuance of a walker. Id. at 12. Medical records also indicate that Mr. Jara tested positive for COVID-19 on December 15, 2020. Id. at 4, 6.

Simply put, Mr. Jara's life is at risk as the coronavirus continues to spread and by way of new and unpredictable strains. Mr. Jara's status as an inmate living in a congregate-style setting makes him more prone to a risk of re-infection from the coronavirus. And, the medium- and long-term impacts and risks of COVID-19 on the human body with multiple co-morbidities remains unclear.

## Request for Relief

Pursuant to 18 U.S.C. § 3582 (c)(1)(A)(i), Mr. Jara respectfully moves for compassionate release and seeks an order re-sentencing him to time served and imposing a special condition that he serve a period of home confinement while on supervised release that will effectively allow him to finish the remaining portion of his prison sentence in an environment in which he will be able to protect himself from exposure to COVID-19. These undisputed facts, together with the fact that Mr. Jara has served nearly half of the statutory time on his mandatory minimum sentence, has a re-entry plan and suffers from a cluster of medical conditions that leaves him more vulnerable to contracting COVID-19 again, fully supports his immediate release from FMC Devens and we ask the Court to grant the relief sought.

## Mr. Jara Exhausted Administrative Remedies

On November 9, 2020, Mr. Jara filed an Inmate Request for Compassionate Release Consideration with the BOP based upon "medical circumstances" and citing among other things his "morbid obesity." Exhibit C at 1-2. That request was denied by the FMC Devens Warden on December 18, 2020. Id. at 3. The denial acknowledged some of Mr. Jara's medical conditions -- obesity, sciatica, gastro-esophageal reflux disease, and headaches -- but nevertheless denied relief by concluding that his medical conditions did not rise to "extraordinary or compelling reasons" and that FMC Devens was able to manage his medical needs. Id. Thus, Mr. Jara has satisfied the exhaustion requirement contained in 18 U.S.C. § 3582(c) and his motion is ripe for review. See 18 U.S.C. § 3582(c)(1)(A),

## _Brooker_ Provides the Court with the Discretion to Grant the Instant Request for a Reduced Sentence

Assuming a defendant has satisfied the exhaustion requirement, the Court "may reduce the term of imprisonment ..., after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). While § 3582(c)(1)(A) also requires that any sentence reduction be

"consistent with applicable policy statements issued by the Sentencing Commission," the Second Circuit held that the First Step Act (FSA) rendered U.S. Sentencing Guidelines Manual § 1B1.13 Application Note 1(D) inapplicable to compassionate release motions brought directly by a defendant. As the Second Circuit has now made clear, the FSA allows district courts "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." United States v. Brooker, 976 F. 3d 228, 237 (2d Cir. Sept. 25, 2020). Here, those reasons include:

(1)     The COVID-19 pandemic puts Mr. Jara's health in danger at the mid-point of his sentence, as he suffers from, among other things, "severe" or "extreme" obesity, Type 2 diabetes mellitus and sleep apnea. Exhibit B at 1-2, 13. According to the records from BOP FMC Devens, where Mr. Jara is incarcerated, there are at least 7 active COVID cases among inmates, with 382 inmates deemed "recovered."[1] According to those same records, there are at least 8 active COVID cases among staff members, with 54 staff members deemed "recovered." Id. Most notably, there have been 10 inmate deaths as a result of COVID-19 at FMC Devens, id., one of which occurred on February 10, 2021. Exhibit H, available at: https://www.bop.gov/resources/news/pdfs/20210211_press_release_dev.pdf (BOP press release explaining inmate Lafortune's tested positively for COVID-19 on December 26, 2020, and passed away on February 10, 2021). Notably given Mr. Jara's having tested positive and as the BOP press release explains, "[o]n Monday, January 18, 2021, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, Mr. Lafortune was converted to a status of recovered following the completion of medical isolation and presenting with no symptoms." Id. Unsurprisingly, the numbers of infected inmates and staff provided by the BOP have swung wildly over the past months.

(2)     Mr. Jara has spent his incarceration productively, working periodically in various positions and preparing for his reentry into the community. Exhibit C. In addition to his work, Mr. Jara has taken a number of education classes. Exhibit D. In short, Mr. Jara is working hard at rehabilitation.

(3)     Mr. Jara has served over 46 months of his 120 month sentence, which with good time credit would require him to remain in custody for approximately 102 months. Exhibit A at 4. This equates to 45% of the eight-and-a-half years Mr. Jara will serve assuming he continues to receive all of his good time credit. Id. Had a statutory mandatory minimum not applied and had the Court imposed a 57-month low-end sentence, Mr. Jara would be *within months of release*. Regardless, this is the longest period of time Mr. Jara has ever served in custody. It is more than four times longer than the sentence he served for the 2014 conviction (Judge Seibel imposed 12 months and 1 day, which resulted in Mr. Jara serving a portion of that time after his receipt of good time credits).

Arguably, the plea agreement's guideline range prior to application of the statutory mandatory minimum is a better measure of an appropriate sentence for the conduct in this case. Application of the statutory mandatory minimum is a product of Congressional enactment, which is distinct from the guidelines and antithetical to a § 3553(a) sentencing analysis where the guidelines are below the

---

[1] See BOP, COVID-19 Coronavirus, available at: bop.gov/coronavirus (as of February 18, 2021).

3

statutory mandatory minimum. The mandatory minimum fails to differentiate among defendants based upon offense conduct. It goes without saying that the statutory mandatory minimum also fails to account for a defendant's background or personal history and characteristics, no matter how mitigating those may be. And though the guidelines themselves account for a defendant's criminal history, i.e., criminal history categories, and provide incrementally higher guidelines for defendants with criminal histories, the statutory mandatory minimum "piles on" so to speak, especially where (as in Mr. Jara's case) the statutory mandatory minimum exceeds the otherwise applicable guidelines range. In fact, the low end of the that guidelines range pursuant to the plea agreement is 57 months, which is *less than half* of what the statutory mandatory minimum requires. The inequity between these two numbers, especially when coupled with Mr. Jara's mitigating personal history and characteristics, is palpable. Compassionate release, however, rectifies this inequity. The district court in United States v. Clark, 12CR104 (SRU), 2021 WL 201253 (D. Conn. Jan. 20, 2021), explained that

> The decision in Brooker additionally made clear that a court may consider "the injustice of a defendant's lengthy sentence" in deciding a motion for compassionate under section 3582. Id. at 238; see also United States v. Vargas, 2020 U.S. Dist. LEXIS 220531, at *13 (S.D.N.Y. Nov. 24, 2020) (collecting cases and noting that "courts have considered the severity or length of a defendant's sentence as part of their evaluation" under section 3582); United States v. McCoy, 981 F.3d 271 (4th Cir. 2020) (affirming district court's consideration of severity of sentence as proper grounds for release under section 3582). In considering whether a sentence is unjustly lengthy, courts have considered disparities between similarly situated codefendants, among other factors. See, e.g., United States v. Haynes, 456 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) (considering "drastic severity" of sentence as compared to codefendants' term); see also United States v. Millan, 2020 U.S. Dist. LEXIS 59955, at *27 (S.D.N.Y. Apr. 6, 2020) (granting motion for release in part to avoid sentencing disparity between defendant and co-defendants).

2021 WL 201253, at *2.

The significant disparity between the otherwise applicable guidelines range and the statutory mandatory minimum is among those "other factors" that the Court can and should consider in this case. In fact, the court in Clark specifically opined that

> Courts have additionally considered the FSA's overall purpose of reducing the overly punitive effects of the statutory schemes that govern sentencing when determining whether extraordinary and compelling circumstances exist. See, e.g., United States v. Marks, 455 F. Supp. 3d 17, 36 (W.D.N.Y. 2020) ("[t]he First Step Act is instructive, inasmuch as it evidences Congress's intent to mitigate the harsh and sometimes unjust effects of the sentencing laws"); see also Haynes, 456 F. Supp. 3d 496, 514 (considering harshness of sentence "as compared to sentences imposed on similar and even more severe criminal conduct today"); Vargas, 2020 U.S. Dist. LEXIS 220531, at *13 (collecting cases and noting "numerous defendants facing

sentences imposed under.... since-invalidated laws or practices have been granted compassionate release").

2021 WL 201253, at *3. Mr. Jara's 10-year sentence is a product of Congressional statute rather than a § 3553(a) sentencing analysis. The more than five-year difference between the two reveals the "overly punitive effects of the statutory scheme[]" that applied to Mr. Jara and limited this Court's discretion at sentencing. Id. Granting compassionate release will "reduc[e] the overly punitive effect[]" in this case. Id.

(4)    The conditions of confinement since the onset of the pandemic have been excessively punitive, with sporadic opportunities for Mr. Jara to engage in any of the positive programming designed to assist with reentry.

(5)    Mr. Jara has a concrete and attainable plan for his reentry into the community, including a safe home to return to, where he can better protect himself from the pandemic, and a mother who is dedicated to working with the Department of Probation to help Mr. Jara attend treatment and remain compliant with his conditions of supervised release. Exhibit F. Sadly, Mr. Jara's father recently passed away.

(6)    Mr. Jara suffers from "deep-rooted mental health and personal challenges," according to the government's sentencing letter in this case. Gov't Sentencing Letter at 5. The presentence report spells out his history of abuse and neglect. PSR at ¶¶ 45-60. Additionally, the PSR discusses findings by psychiatrists that Mr. Jara suffers from "chronic underlying mental health issues," id. at ¶ 77, including bipolar and schizophrenia. Id. at ¶ 68. As the government advocated in its sentencing letter, "the defendant's young age and his tumultuous childhood and home life are [] appropriate considerations for the Court at sentencing . . .." Gov't Sentencing Letter at 5. They also are appropriate considerations for the Court in the context of compassionate release.

It is assumed that the government will object to the relief sought. Outside of arguing that Mr. Jara's health issues are not as serious as he makes them out to be, the government will likely oppose the motion based on technical arguments concerning the factors that BOP deems to constitute extraordinary and compelling reasons. But this Court is not bound by BOP's determination of what constitutes extraordinary or compelling circumstances; instead, this Court can exercise its broad discretion to consider any factor or collection of factors it deems relevant.[2]

Here, there are extraordinary and compelling reasons to reduce Mr. Jara's sentence, and after

---

[2] As a further byproduct of Brooker, a court evaluating a motion for compassionate release brought by a defendant need not consider BOP's guidance concerning what constitutes an extraordinary and compelling reason under § 3582(c)(1)(A). See Brooker at 238 n.5. The bottom line, therefore, is that the district court has broad discretion in evaluating a defendant's motion for compassionate release: "[t]he amendment of the compassionate release statute by the FSA freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them when seeking a sentence reduction." Id. at 237.

reviewing the factors set forth in 18 U.S.C. § 3553(a), the Court should find that Mr. Jara's release comports with all the purposes of sentencing. For these reasons and those set forth below, the Court should reduce Mr. Jara's sentence to a term of time-served and order him released to home confinement. Upon his federal release, Mr. Jara will remain subject to a number of strict conditions of release, including persistent supervision by the Department of Probation and state authorities, and registration as a sex offender.[3]

The Second Circuit recently has ruled that § 1B1.13 "is not applicable to compassionate release motions brought by defendants" (as opposed to motions brought by the Bureau of Prisons) and "*cannot constrain district courts' discretion* to consider whether any reasons are extraordinary and compelling" in deciding those defendant motions. United States v. Brooker, No. 19-3218, 2020 WL 5739712, *6 (2d Cir. Sept. 25, 2020) (emphases added); see also id. at *7 (holding that "[n]either Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion" in deciding a defendant's compassionate release motion).

Applying the Second Circuit's decision in Brooker, the Honorable Valerie Caproni recently granted defendant Jeffrey Correa's request that he be released from FCI Danbury early in light of the COVID-19 pandemic. See United States v. Correa, 80-CR-1026 (VEC), 2020 WL 7490098 (Dec. 21, 2020) at *1. In opposing Mr. Correa's request, the government argued that no compelling and extraordinary reasons supported release because Correa's medical conditions still allowed him to provide self-care and "do not place him at greater risk for complications were he to contract COVID-19." Id. at *2. The Court disagreed, granting the motion over the government's objection and ordering Correa's immediate release from federal custody to New York State custody so that the state could determine whether release from a concurrent state term was appropriate. Id. at *7.

Judge Caproni set forth the post-Brooker law for determining motions for compassionate release as follows:

> the court "may reduce the term of imprisonment ..., after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). While § 3582(c)(1)(A) also requires that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," the Second Circuit recently held that the FSA rendered U.S. Sentencing Guidelines Manual § 1B1.13 Application Note 1(D) inapplicable to compassionate release motions brought directly by a defendant. See Brooker, 976 F.3d at 230; see also id.

---

[3] If released to his family, Mr. Jara will live with his mother, Jacqueline Gutierrez. Exhibit F. Although the Department of Probation has not yet conducted a home visit and approved that location for Mr. Jara's home confinement, Ms. Gutierrez's dedication to her son is unwavering. In her home Mr. Jara will have his own room and be able to isolate himself and take the other precautionary and hygienic measures against COVID-19. She will monitor Mr. Jara's compliance with conditions, including his maintaining communications with his supervising probation officer and attending any and all treatment, including sex offender treatment.

at 238 n.5 (finding that a court considering a motion for compassionate release brought by a defendant need not consider BOP's guidance concerning what constitutes an extraordinary and compelling reason). "The amendment of the compassionate release statute by the FSA 'freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them' when seeking a sentence reduction." [United States v.] Fisher, 2020 WL 5992340, at *3 [(S.D.N.Y. Oct. 9, 2020)] (quoting Brooker, 976 F.3d at 237).

2020 WL 7490098, at *3. Judge Caproni later characterized the Brooker standard as providing district courts with "near-absolute discretion in determining what constitutes an extraordinary and compelling circumstance warranting relief when deciding motions for compassionate release brought directly by a defendant." Id. (citing Brooker, 976 F.3d at 237; United States v. Vargas, No. 88-CR-325, 2020 WL 6886646, at *4 (Nov. 24, 2020)).

The Court then applied the Brooker test and found that Correa's medical conditions, including his obesity, justified compassionate release:

> based on the confluence of his medical concerns and an ongoing outbreak of COVID-19 at his facility, Mr. Correa has satisfied his burden of demonstrating extraordinary and compelling reasons justifying an early release. Mr. Correa's litany of medical issues includes two chronic conditions, HIV and asthma; he is also significantly overweight, has suffered from "painful rash, pustules and lesions" since at least March 2020, and has chronic lower back pain.
>
> ***
>
> The Government's argument that Mr. Correa "has no medical conditions placing him at greater risk for complications were he to be infected by COVID-19" is not only incorrect, it presumes a level of certainty and understanding that the medical community does not have. Gov't Opp. at 5. According to the Centers for Disease Control ("CDC"), each of Mr. Correa's chronic conditions either leaves him at increased risk of severe illness from COVID-19 or, at minimum, might put him at increased risk for severe illness from COVID-19. See People with Certain Medical Conditions, Ctrs. for Disease Control and Prevention (Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (listing obesity as a condition that places an adult at "increased risk of severe illness" from COVID-19 and listing "[a]sthma (moderate-to-severe), "[i]mmunocompromised state (weakened immune system) from ... HIV," and "[o]verweight" as conditions that might place an adult at increased risk for severe illness from COVID-19).
>
> ***

This Court, then, has little hesitancy in joining a number of other courts in finding

7

that Mr. Correa's medical conditions rise to the level of extraordinary and compelling reasons justifying compassionate release.

2020 WL 7490098, at *4-5. In the context of the § 3553(a) factors, the Court noted among other things Correa's own history of being sexually abused, the "extremely harsh conditions of confinement," and Correa's need for medical care "considering his numerous health issues and the ongoing risk of COVID-19." Id. This mitigation outweighed the lack of sex offender-related treatment while in custody, which the Court considered in the context of Correa's danger to the community. Id. Admittedly, Correa served approximately 12 years in custody, only had six months remaining on his federal sentence and, thereafter, still had to complete or get paroled on a concurrent state sentence before going home. Id. at *6. These two things "allowed the Court to find that reducing Mr. Correa's federal sentence would be consistent with the section 3553(a) factors." Id. at *5. However, the compassionate release grant remains significant given the nature of the case. Correa had been serving a federal prison term for his production of child pornography conviction, which also involved hands-on, sexual contact with a family member by Correa and other adults. Id. at *1, *6. And, Judge Caproni's comment that "[t]he Court also hopes that [the state's parole] decision will get Mr. Correa closer to receiving the therapy and rehabilitative services he should have received upon entering federal custody," id. at *7, strongly suggests that getting Correa into treatment was a priority over additional time in custody regardless of the jurisdiction.

The logic and reasoning in Correa applies here. If anything, the Brooker test applies more strongly here than in Correa and fully supports Mr. Jara's request for his release from federal detention now, instead of October 4, 2025. As noted in the attached BOP medical records, Mr. Jara suffers from severe or extreme obesity (he has a BMI of 48.7), sleep apnea and Type 2 diabetes mellitus. Exhibit B at 1-2, 13. Mr. Jara's numerous health issues and heightened vulnerability to COVID-19 are relevant to the factors "history and characteristics of the defendant" and the "need ... to provide the defendant with needed ... medical care," which Correa identified as "factors that now weigh heavily in favor of reducing [the defendant's] sentence." 2020 WL 7490098, *6 (citing 18 U.S.C. § 3553(a)). The other relevant sentencing factors also support Mr. Jara's immediate release.

With regard to the nature and circumstances of the offense, Mr. Jara's count of conviction related to the possession of child pornography. Such conduct is distinct and a far cry from the circumstances in Correa. Mr. Jara's case did not involve allegations of producing child pornography or any hands-on, sexual contact. In the absence of such conduct, the danger to the community analysis is far different than in Correa and more supportive of release here, even if the sentencing reduction ultimately results in years rather than months less time. This sliding-scale type of analysis makes sense in a compassionate release context when weighing the severity of the conduct against the other factors, including the extent and severity of a defendant's medical issues and the risks those issues create relative to COVID-19. The more severe the criminal conduct is, the more severe the medical issues and COVID-19 risk must be to justify a sentencing reduction. Mr. Jara's BMI by definition and as discussed below is consistent with "extreme" or "severe" obesity. Although Mr. Jara is not facing another term of incarceration due to other criminal charges that would delay any release, which is a good thing, there remains a backstop to protect the community. The Court imposed a lifetime term of supervised release, which will allow for Probation to monitor Mr. Jara in perpetuity.

More crucially, the Court can impose conditions that include home incarceration, location monitoring, no access to the internet, and sex offender-related treatment, the latter of which oddly does not appear to have been made available to Mr. Jara at FMC Devens. Exhibit D. Accordingly, once at home, Mr. Jara also will be able to get any of the medical and psychological help that may be appropriate to ensure he does not re-offend. Given all this, an additional number of years at FMC Devens is not needed to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(c).

As to specific deterrence, Mr. Jara has spent more than 46 months in custody without major incident, paying for his crime. Exhibit G. This is the longest sentence he has eve served. And, he also has not lost any of his good time credit. Exhibit A at 4. Even before imposition of sentence, he accepted responsibility. PSR at ¶¶ 34-35. He has been specifically deterred. See 18 U.S.C. § 3553(a)(2)(B).

As to just punishment that reflects the seriousness of the offense and promotes respect for the law (id. § 3553(a)(2)(A)), Mr. Jara has served more than 46 months in custody, which is more than four times longer than his only other sentence of incarceration. This time is 45% of the time he will have to serve if he receives all of his good time credit. As argued above, the statutory mandatory minimum is a poor measure of an appropriate sentence compared to the guidelines, especially where as here such a large disparity exists between the two. Compassionate release can rectify this disparity and the overly punitive effects of the statutory schemes that governed sentencing. Moreover, the last year Mr. Jara has "spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on [him] beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." United States v. Lizardi, 11 Cr. 1032-55 (PAE), Opinion and Order on Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(I) at 7 (S.D.N.Y. Oct. 9, 2020); accord Correa, 2020 WL 7490098, at *6 ("the Court believes that the extremely harsh conditions of confinement to which Mr. Correa has been subjected over the past nine months renders a minimal reduction below that mandatory minimum warranted and just") (citing United States v. Rodriguez, No. 00-CR-761, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ("[T]he risk of suffering severe health consequences if [defendant] contracts COVID-19, coupled to the severe conditions imposed by the concomitant lockdowns and restrictions that are necessary to ensure [defendant's] safety, means that 'the actual severity of [defendant's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.' " (quoting United States v. Mel, No. TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020))). In effect, the lockdown conditions and fear caused by the pandemic has increased Mr. Jara's punishment to levels unforeseen when he was sentenced and supports his immediate release.

In sum, all the relevant § 3553(a) factors support expediting Mr. Jara's release from federal custody at this time. For much the same reasons, the harsh consequences of the lockdown restrictions, together with the abiding and serious danger COVID-19 poses to medically vulnerable inmates like Mr. Jara, are "extraordinary and compelling reasons" justifying his early release. The CDC has recognized two of Mr. Jara's medical conditions as medical conditions that, together and separately, place him at an increased risk of severe illness from COVID-19. First, Mr. Jara is at increased risk

because he is severely obese. The CDC guidance provides that "[h]aving obesity, defined as a body mass index (BMI) between 30 kg/m² and <40 kg/m² *or severe obesity (BMI of 40 kg/m² or above)*, increases your risk of severe illness from COVID-19." CDC, People with Certain Medical Conditions (Feb. 3, 2021), available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/ people-with-medical-conditions.html (emphasis added). The CDC acknowledges that "[a]dults *of any age* with the following conditions are at increased risk of severe illness from the virus that causes COVID-19: ... Severe Obesity (BMI ≥40 kg/m²) ...." Id. (emphasis added). According to BOP health providers at FMC Devens as of January 22, 2021, Mr. Jara "weighs approximately 349 [pounds] with a BMI of *48.7*." Exhibit B at 1 (emphasis added). This BMI of 48.7 must be put into context to demonstrate the severe nature of Mr. Jara's obesity and in turn the risk of severe illness from COVID-19 that exists.

An obesity classification is driven by an individual's body mass index (BMI). CDC, Overweight & Obesity (Sept. 7, 2020), available at https://www.cdc.gov/obesity/adult/defining.html. According to the CDC, "[i]f your BMI is 30.0 or higher, it falls within the obese range." Id. "Obesity [also] is frequently subdivided into categories" (Class 1 through 3), according to the CDC. Id. The most severe category (Category 3) applies to individuals with a "BMI of *40 or higher*. Class 3 obesity is sometimes categorized as 'extreme' or 'severe' obesity." Id. (emphasis added). Again, Mr. Jara's BMI is *48.7*, Exhibit B at 1, which clearly places Mr. Jara in the most severe class - Class 3 - and by a wide margin. His obesity, by CDC definition, is not simply "severe." It is "extreme."

The CDC issued that guidance as studies have shown that both overweight and obese people were "at increased risk for requiring mechanical assistance with breathing and were more likely to die." Roni Caryn Rabin, *Extra Pounds May Raise Risk of Severe Covid-19*, N.Y. TIMES, Oct. 10, 2020, available at: https://www.nytimes.com/2020/10/10/health/coronavirus-obesity-weight.html. Specifically, "[o]verweight patients were 40 percent more likely to die than healthy-weight patients, while obese patients were at 30 percent greater risk, compared with the healthy-weight patients." Id. Hospitalization rates relative to the characteristics of patients hospitalized with COVID-19 by morbidity, particular obesity, are telling. Mr. Jara's obesity condition correlates to individuals with higher rates of hospitalization per CDC tracking. See CDC, COVID-NET, A Weekly Surveillance Summary of U.S. COVID-19 Activity (includes data from March to November 2020), available at: https://gis.cdc.gov/grasp/covidnet/COVID19_5.html.



As many courts in this District have recognized, the CDC guidelines make clear that obesity places defendants at heightened risk of severe complications were they to contract COVID-19. See, e.g., United States v. Brito, No. 13-CR-589 (PKC), 2021 WL 275538, at *2 (S.D.N.Y. Jan. 27, 2021) (holding that as per the CDC "adults with obesity are at an increased risk of severe illness from COVID-19" and explaining that "[a]ssuming that Brito suffers from obesity and hypertension the Court concludes that Brito is at elevated risk of serious illness or death if he were to be infected with COVID-19."); United States v. Camacho, No. 13 CR. 58 (AKH), 2021 WL 260122, at *1 (S.D.N.Y. Jan. 26, 2021) (holding that defendant "extreme obesity and allied conditions, subject[] defendant to increased risk of complications from COVID-19" but noting that defendant already had COVID-19); United States v. Newton, No. 3:18-cr-0022-8 (VLB), 2020 WL 6784267, at *5 (D. Conn. Nov. 18, 2020) ("The Court acknowledges that Mr. Newton's obesity, which is marginal, places him at a heightened risk of severe complications were he to contract the virus."); United States v. Davila, No. 16-cr-00185 (MPS), 2020 WL 6499562, at *2 (D. Conn. Nov. 5, 2020) ("As the Government concedes, ... [the defendant's] obesity places him at increased risk of severe illness from COVID-19 under the CDC guidelines.").

As a result, obesity, taken alone, may constitute an extraordinary and compelling reason for release. See United States v. Bruno, No. 18-cr-00061 (VAB), ECF No. 137 (D. Conn. Aug. 3, 2020). Other courts across the Second Circuit, and district courts elsewhere throughout the country, have similarly found that obesity alone may satisfy the extraordinary and compelling prong of the compassionate release inquiry. See, e.g., United States v. Dasilva, No. 15-cr-95 (AJN), 2020 WL 5764286 at *2 (S.D.N.Y. Sept. 28, 2020) (slip op.) ("Mr. Dasilva's obesity alone suffices to satisfy the first prong of the analysis, even without reaching Mr. Dasilva's other health conditions."); United States v. Dawson, No. 18-40085 (HLT), 2020 WL 1812270, at *5 (D. Kan. Apr. 9, 2020) ("The court finds that [the defendant] has established that his obesity puts him at an increased risk for severe illness

11

if he were to contract COVID-19, which weighs in favor of finding exceptional reasons."); United States v. Brown, No. ELH-01-377, 2020 WL 5747194, at *8 (D. Md. Sept. 25, 2020) (mem.) (noting that "numerous courts have found that, in light of the COVID-19 pandemic, severe obesity, and in particular a BMI above 30, qualifies as a compelling reason for compassionate release," and collecting cases). Obesity, however, is not the only medical condition that Mr. Jara suffers from and is not the only condition that the CDC expressly identifies as correlating to a higher risk of severe illness from COVID-19.

Mr. Jara also suffers from Type 2 diabetes mellitus. Exhibit B at 1, 13. The CDC also acknowledges that "[a]dults of any age with the following conditions are at increased risk of severe illness from the virus that causes COVID-19: ... Type 2 diabetes mellitus." CDC, People with Certain Medical Conditions (Feb. 3, 2021), available at: https://www.cdc.gov/coronavirus/2019-ncov/ need-extra-precautions/people-with-medical-conditions.html. According to the CDC, "[h]aving type 2 diabetes increases your risk of severe illness from COVID-19." Id. District courts, including this Court, have recognized that diabetes places individuals at a higher risk of a devastating outcome if they contract COVID-19. See, e.g., United States v. Lewis, No. 16-CR-302 (KMK), 2020 WL 2081374, at *1 (S.D.N.Y. Apr. 30, 2020) (compassionate release appropriate where "[i]t [was] beyond dispute that [defendant was] at high risk from COVID-19, as ... [his] diabetes is one of the most significant comorbidity factors and that is no doubt heightened by [his] high blood pressure."); United States v. Hansen, No. 07-CR-00520(KAM), 2020 WL 1703672, at *9 (E.D.N.Y. Apr. 8, 2020) ("Mr. Hansen has Type II diabetes, and research by the World Health Organization suggests that the risk of death from COVID-19 is significantly higher for individuals who, like Mr. Hansen, are over 60 years old and diabetic.").

The combination of these conditions - obesity and diabetes - has qualified as "extraordinary and compelling reasons" for release during the current COVID-19 pandemic. See e.g., United States v. Franco, No. 12 CR. 932 (PAC), 2020 WL 4344834, at *2 (S.D.N.Y. June 24, 2020) (granting compassionate release for "41-year[] old defendant suffering from severe diabetes, hypertension, and obesity (see Gov. Ex. A), all three of which are conditions the CDC has identified as posing a heightened risk of severe illness and fatality from COVID-19" noting that government concedes such medical condition qualify as "extraordinary and compelling reasons" for release during the current COVID-19 pandemic); United States v. Zukerman, No. 16 CR. 194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (finding defendant's age combined with medical conditions of diabetes, hypertension and obesity, constituted "extraordinary and compelling reasons" to order compassionate release); see also United States v. Daugerdas, – F. Supp. 3d –, 2020 WL 2097653, at *3 (S.D.N.Y. May 1, 2020) (defendant serving a 180-month term of imprisonment and incarcerated at a facility with no reported cases of COVID-19; the district court found that his underlying health conditions—Type II diabetes, obesity, hypertension, and high cholesterol—and the risk of COVID-19 in prisons generally constituted an extraordinary and compelling reason, but did not ultimately grant compassionate release).

Mr. Jara's sleep apnea also cannot ignored. Exhibit B at 1, 13. "Courts have granted compassionate release to incarcerated individuals with obesity and sleep apnea because those conditions place them

at high risk for serious complications due to COVID-19." United States v. Delgado, 457 F.Supp.3d 85, 90 (D. Conn. 2020) (citing cases including United States v. Gross, No. 15-CR-769 (AJN), 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (granting compassionate release to an incarcerated person who was "severely overweight and suffers from high blood pressure and sleep apnea," finding that "the combination of [his] health conditions and his incarceration compounds the risk COVID-19 poses to him, placing him in particularly grave danger" (internal citation and quotation marks omitted)).

These serious underlying health conditions place Mr. Jara at a greater risk of negative complications if he is re-infected with COVID-19. In turn, while the BOP may self-servingly contend that FMC Devens is a safe place (Exhibit C), it is beyond any real dispute that the facility has experienced several outbreaks of COVID-19, see e.g., United States v. Maya Arango, No. 15-CR-104 (JMF), 2020 WL 3488909, at *2 (S.D.N.Y. June 26, 2020) (acknowledging prevalence of COVID-19 at FMC Devens, which at the time reported 20 prisoners and one staff member are actively infected), and the physical layout of FMC Devens make it impossible for the inmates to practice the social distancing and other prophylactic measures necessary to protect themselves from this easily transmitted virus. When not quarantined, it is counsel's understanding that Mr. Jara is jailed in a dormitory, where they sleep in rows of bunk beds located less than 6 feet from each another, with the bed to left and right of each inmate almost within arm's reach. Inmates share showers, toilets, and sinks, and every inmate eats their meals in the dorm room. Assessing these conditions, courts have wisely concluded that true social distancing appears to be unachievable in jails where the risk of transmission is significantly heightened.

FMC Devens is not isolated from the community. New inmates, staff, contractors, and vendors cycle in and out of the prison. The United States is experiencing a "second wave" of the coronavirus and prisons are experiencing the same. In May 2020, there was a spike in the number of positives in the inmate population at FMC Devens, United States v. Chester, 436 F.Supp.3d 342 (W.D.N.Y. 2020) (noting "the positive trend of inmate virus contraction at FMC Devens" and granting release to compromised inmate who had but two months left on his sentence), and there is no telling what the extent of a second wave will be for the facility. COVID-19 is a pernicious and recurrent foe. "Those detained in jails and prisons face particularly grave danger [from COVID-19]." United States v. Nkanga, 18 Cr. 713 (JMF), 2020 WL 1529535, *1 (S.D.N.Y. Mar. 31, 2020). The Court should find the same risk of danger still exists, and grant Mr. Jara compassionate release.

### Mr. Jara's Positive COVID-19 Diagnosis in December 2020 Does Not Preclude Relief

Mr. Jara recently tested positive for COVID-19 on December 15, 2020, as documented in the attached medical records. Exhibit B at 4, 6. This positive diagnosis, however, does not preclude relief in this case. While Mr. Jara currently is not experiencing symptoms, Mr. Jara is rightfully very concerned about his health. As set out in detail above, Mr. Jara suffers from several serious health issues that the CDC expressly identifies as aggravating in the context of COVID-19. And, despite BOP efforts, FMC Devens was unable to shield Mr. Jara from the coronavirus. It also uncertain what long-term effects Mr. Jara may endure as a result of his experiencing COVID-19 or how new and more communicable strains of COVID-19 might impact him.

13

Moreover, even if Mr. Jara has "recovered," re-infection is possible.[4] Because of this, compassionate release has been granted to inmates who have recovered from COVID-19. See e.g., United States v. Armstrong, No. 18cr5108, 2020 WL 4366015, at *2 (S.D. Cal. July 30, 2020) (granting release to recovered inmate; noting that another inmate at Terminal Island "was hospitalized and died ... after the BOP had shown him recovered" and "find[ing] it particularly persuasive that an inmate, being housed at the same facility as Mr. Armstrong, was hospitalized and died after he was pronounced 'recovered' by the BOP"); United States v. Davis, No. 06cr20020, 2020 WL 4049980 (C.D. Ill. July 20, 2020) (granting sentence reduction for obese diabetic inmate who tested COVID-positive where "the Court finds that there is a chance that Defendant may contract COVID-19 again" and "the CDC recognizes that it is possible for an individual who had COVID-19 to become infected again by the virus."); United States v. Malufau, 474 F.Supp.3d 1106 (D. Haw. 2020) (granting sentence reduction for inmate with obesity, diabetes, who "tested positive for [COVID]-19 and was hospitalized for nine days").

Courts in this circuit have similarly ordered the compassionate release of inmates post-infection. The Honorable Nicholas G. Garaufis ordered the release of a COVID- positive inmate from FCI Fort Dix. United States v. Mongelli, No. 02CR307 (NGG), 2020 WL 6449237 (E.D.N.Y. Nov. 3, 2020). In that case, Judge Garaufis had initially denied the defendant's compassionate release application based upon the low number of cases at FCI Fort Dix. Two months later, however, he revisited that determination, holding that

> [i]n light of Mr. Mongelli's serious underlying health condition, his recent COVID19 infection, and the failure of the Bureau of Prisons to prevent and control a COVID-19 outbreak at FCI Fort Dix, the court finds that the circumstances of his confinement "substantially diminish[]" his "ability ... to provide self-care." Even if the court credits the Government's representations that Mr. Mongelli currently has only mild symptoms associated with COVID-19 and has received adequate care and treatment, there is no guarantee that Mr. Mongelli's symptoms and medical needs will remain so minimal, especially given his underlying condition. The court is convinced that Mr. Mongelli faces severe health risks and that he will be better able to access whatever care and treatment he may require in the future if he is not incarcerated. The court therefore concludes that "extraordinary and compelling reasons" warrant a reduction of Mr. Mongelli's sentence. Id. at *3 (internal citation omitted) (quoting U.S.S.G. § 1B1.13 Application Note l(A)).

2020 WL 6449237, at *3.

More recently, The Honorable Joanna Seybert granted a compassionate release motion for a defendant who tested positive for COVID-19. United State v. Vega, No. 89CR0229 (JS); 2020 WL 7060153, *1 (E.D.N.Y. Dec. 2, 2020). Judge Seybert explained that

---

[4] CDC, How You Can be Around Others After You Had or Likely Had COVID-19 (December 1, 2020), available at: https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html (last visited on February 10, 2021).

[h]ere, given Defendant's underlying health conditions, "his recent COVID-19 infection, and the failure of the Bureau of Prisons to prevent and control a COVID-19 outbreak at FCI Fort Dix," the Court finds that continued confinement "'substantially diminishes' his 'ability ... to provide self-care.'" United States v. Mongelli, No. 02-CR-0307, 2020 WL 6449237, at *3 (E.D.N.Y. Nov. 3, 2020) (quoting U.S.S.G. § 1B1.13 Application Note 1(A)) (alteration omitted); United States v. Barajas, No. 18-CR-0736, 2020 WL 3976991, at *9 (S.D.N.Y. July 13, 2020) ("But the Court is not only evaluating Mr. Barajas's application based on his pre-existing conditions. Rather, the Court must consider the full record before it. That includes Mr. Barajas's recent COVID-19 diagnosis and the highly disturbing circumstances surrounding it."). Indeed, "there is no guarantee that [Defendant's] symptoms and medical needs will remain so minimal, especially given his underlying condition[s]," Mongelli, 2020 WL 6449237, at *3, and "some research, to date, at least indicates that the absence of severe symptoms does not necessarily diminish the risk of long-term health complications," Barajas, 2020 WL 3976991, at *10 (citations omitted). Given that there is "extraordinary little [known] about the long-term prognosis for a patient diagnosed with COVID-19," the Court concludes that were Defendant "[c]onfined to a small cell where social distancing is impossible," he "cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus," that, unfortunately, he already contracted. United States v. Perez, 451 F. Supp. 3d 288, 293-94 (S.D.N.Y. 2020); see also United States v. Staats, No. 17-CR-0461, 2020 WL 6888224, at *2 (E.D. Pa. Nov. 24, 2020) (granting compassionate release where a defendant tested positive for COVID-19 and noting that "Fort Dix is experiencing an uncontrolled outbreak of COVID-19" and that the Government "clearly [has] not protected [the defendant] and the 245 other prisoners and 18 staff who contracted COVID-19"). For these reasons, the Court finds "extraordinary and compelling circumstances" warrant a reduction of Defendant's sentence.

2020 WL 7060153, *3. Notably, Judge Seybert also stated that

> the "uncertainties" surrounding the long-term effects of COVID-19 "coupled with the fact that [Defendant] has already been infected once," raises the "very real risk that re-exposure to the virus could spell disaster for [Defendant], a risk that appears to be heightened at" FCI Fort Dix. Barajas, 2020 WL 3976991, at *10 (collecting cases where courts granted compassionate release to a defendant who already contracted COVID-19 because, for example, "it [was] uncertain whether [defendant] [could] contract COVID-19 more than once, and the potential long-term effects of the illness are still undetermined" when factoring his health condition).

2020 WL 7060153, *3, n.4.

The Honorable Nelson Roman, whose decision in Barajas is cited in Vega, also has granted compassionate release for a defendant who tested positive for COVID-19. Judge Roman explained

that

[i]n the backdrop of all these issues at [the jail housing the defendant] is our lack of understanding about COVID-19. In general, we still know extraordinarily little about the long-term prognosis for a patient diagnosed with COVID-19. Indeed, although the Government and its witnesses stunningly minimize Mr. Barajas's condition as mild or asymptomatic, some research, to date, at least indicates that the absence of severe symptoms does not necessarily diminish the risk of long-term health complications. See, e.g., Pien Huang, We Still Don't Fully Understand the Label "Asymptomatic," NPR (June 23, 2020), https://www.npr.org/sections/goatsandsoda/2020/06/23/864536258/we-still-don't-fully-understand-the-label-asymptomatic ("The study shows that being asymptomatic doesn't always mean that no damage has occurred in someone's body; follow-up studies will help researchers assess for potential long-term impacts."). There is also a palpable, although admittedly uncertain, possibility of reinfection—a concern that is accentuated by [the jail's] handling of this situation. See CDC, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html ("There are no data concerning the possibility of re-infection with SARS-CoV-2 after recovery from COVID-19."); World Health Org., "Immunity Passports" in the Context of COVID-19 (Apr. 24, 2020), https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19 ("There is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."); see also Physician's Weekly, Risk for COVID-19 Reinfection Remains Unknown (June 18, 2020) https://www.physiciansweekly.com/risk-for-covid-19-reinfection-remains-unknown/ (detailing that although there is some evidence that other common coronaviruses have had instances of repeated infections, it is unclear if this will apply to COVID-19). When these uncertainties are coupled with the fact that Mr. Barajas has already been infected once and may very well have an undiagnosed asthmatic condition, there is a very real risk that re-exposure to the virus could spell disaster for Mr. Barajas, a risk that appears to be heightened at [the jail]. Cf. United States v. Yellin, No. 3:15-cr-3181-BTM-1, 2020 WL 3488738, at *3 (S.D. Cal. June 26, 2020) (granting compassionate release application of inmate with underlying medical conditions who was infected with COVID-19, but did not develop severe symptoms, because of, among other things, risk that reinfection would have on the inmate's health); United States v. Williams, No. 19-cr-134-PWG, 2020 WL 3073320, at *4 (D. Md. June 10, 2020) (granting compassionate release application where defendant with an underlying health condition had contracted COVID-19 but recovered because "it [was] uncertain whether [defendant] [could] contract COVID-19 more than once, and the potential long-term effects of the illness are still undetermined" when factoring his health condition).

16

Barajas, 2020 WL 3976991, at *10.

For all of these reasons, the same relief is warranted here. Even if a person infected with COVID-19 survives, the experience is traumatic. Moreover, survivors of COVID-19 possibly can face lasting physical damage and irreversible functional limitations. And, re-infection remains possible, even according to the CDC. Thus, Mr. Jara's medical conditions continue to create a grave risk should he become reinfected with COVID-19.

## Conclusion

Given all this, the Court should not leave Mr. Jara in custody and in danger of COVID-19, particularly where scientists still have not yet ascertained the medium- and long-term impacts and risks of COVID-19 on the human body with multiple co-morbidities. And, because re-infection remains possible. Instead, the Court should grant the motion and order Mr. Jara's immediate release from federal custody.

Thank you for your consideration of this matter.

Respectfully Submitted,

/s/ Jason I. Ser
Jason I. Ser
Assistant Federal Defender

cc: Jennifer Ong, A.U.S.A.

Application for compassionate release, pursuant to 18 U.S.C. Section 3582, is denied. First, while Mr. Jara may have some health conditions that place him at risk from contracting COVID-19, he already has contracted COVID-19 and has recovered. While this does not bar early release, it does undermine the strength of his claim that he was established extraordinary and compelling reasons for release. Second, data as of today suggest that the COVID situation at FMC Devens is under control, as only 2 inmates and 0 staff have tested positive for COVID-19. Third, equally current data establish that approximately half of the inmates and hundreds of staff members at Devens have been vaccinated and the Court is aware that BOP is aggressively moving to vaccinate as many inmates and staff as possible in the coming weeks. All of these developments greatly reduce the risks of COVID-19 to Mr. Jara. Separately, consideration of the Section 3553(a) factors argues strongly against early release. While Brooker may give courts the discretion to grant early release, as is spelled out in great detail in counsel's letter, it does not require release. Here, the sentence Mr. Jara received was largely the result of his recidivism and the extremely serious nature of his repeat conduct. While Mr. Jara has taken positive steps since his incarceration, they do not change the grim fact that Mr. Jara is a repeat offender. Moreovoer, he has served less than half of his sentence, so in the Court's view, early release would undermine the respect for the law and general deterrence. Therefore, the Court declines to exercise its discretion to grant early release.

So Ordered.

4/23/21

17